# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# ALEXANDRIA DIVISION

JENA BAND OF CHOCTAW
INDIANS, ET AL.

CIVIL ACTION NO. 98-CV-0829

-vs-

JUDGE LITTLE

TRI-MILLENNIUM
CORPORATION, INC., ET AL.

## Memorandum Ruling[1]

Before the court are two motions filed by Defendants, Tri-Millennium Corporation, Inc. ("Tri-Millennium") and BBC Entertainment, Inc. ("BBC"). First, on 23 June 2004, Defendants filed Defendants' Motion to Dismiss or for Summary Judgment. Then, on 23 July 2004, a second Defendants' Motion to Dismiss or for Summary Judgment was filed. Each of Defendants' motions is predicated upon the pendency of the related state court action or, in the alternative, the settlement agreements entered into by the parties in connection with the state court action, both of which Defendants argue preclude the court from considering this case. The court, therefore, will address the requests made in these motions in the aggregate.

In their pleadings, Defendants seek dismissal of or summary judgment upon Plaintiffs', the

---

[1] Much of the following discussion is also presented by the court in a Memorandum Ruling entered on this day in the companion case <u>Machal, Inc. v. Jena Band of Choctaw Indians, et al.</u>, Civil Action No. 04-1403.

Jena Band of Choctaw Indians ("Jena Band") and various tribal council members, action for a declaratory judgment. Plaintiffs' complaint seeks a declaration that certain agreements between Jena Band and Defendants are void under federal law and that a Louisiana state court does not have jurisdiction over an ongoing action by Defendants seeking enforcement of those agreements. Plaintiffs dispute this and request that the court: 1) deny Defendants' motions, 2) lift its abstention order of 21 December 1998, 3) address the merits of the case, and 4) enter a judgment declaring that the state court is without jurisdiction to consider Defendants' claims.

For the following reasons, Defendants' motions are granted in part and denied in part.

## I. Procedural and Factual History

In 1995, Jena Band became a federally recognized Indian tribe and began to seek reservation lands in Louisiana upon which it could operate a gambling casino. In furtherance of its intention to operate a casino, Jena Band entered into a set of agreements ("Development Agreements") with Tri-Millennium and BBC in which Defendants agreed to assist Jena Band with various aspects of developing a casino, including acquiring land, constructing a casino, and obtaining various government approvals. As compensation for their assistance, Jena Band promised Defendants the right to control certain aspects of the casino development and the right to certain payments.

Pursuant to 25 U.S.C. § 2711, however, contracts for the management of a tribal gaming operation ("management contracts") must be approved by the National Indian Gaming Commission ("NIGC"). If a management contract is not approved by the NIGC, it is void. 25 C.F.R. § 533.7 (West 2005). In light of this, Jena Band contacted the NIGC by letter in October of 1996 seeking

a declination letter – which is essentially an opinion letter by the NIGC – stating that it does not believe that the Development Agreements require approval because it does not consider them to be management contracts. See 25 C.F.R. § 502.15 (West 2005). In its response, however, the NIGC stated that it believed that the Development Agreements were management contracts and would, therefore, be void without NIGC approval.

Jena Band informed Defendants that the Development Agreements were void. It did not attempt to have the Management Agreements approved by the NIGC. Instead, in October of 1997, Jena Band entered into a Financing and Brokerage Agreement with a third party, Machal, Inc. ("Machal"). This agreement purports to assign to Machal many of the rights and responsibilities that the Development Agreements purported to give to Defendants.

In response, Defendants filed suit in the 24th Judicial District Court, Jefferson Parish, Louisiana. They asserted various causes of action against Jena Band, including a claim for breach of contract. Jena Band did not seek to remove the state court suit. Plaintiffs filed a declinatory exception with the Louisiana court in which they contended that the state court was without subject matter jurisdiction. That issue was litigated, and the state court found that it did have subject matter jurisdiction over the dispute. The state court also entered a preliminary injunction enjoining Jena Band from negotiating for the development or management of a casino, which Plaintiffs wish this court to dissolve.

Jena Band then brought suit in this court seeking a declaratory judgment that the Development Agreements are void pursuant to the Indian Regulatory Gaming Act ("IGRA"), that Jena Band is immune from suit by virtue of its sovereign immunity and that the state court lacks

subject matter jurisdiction to hear Defendants' breach of contract action. 25 U.S.C. § 2711, *et seq*, (West 2005).

On 16 December 1998, this court entered a ruling staying the proceedings based on a finding that it was required to abstain by the Anti-Injunction Act. 28 U.S.C. § 2283 (West 2005). Instead of dismissing this case, however, the court stayed the proceedings until such time as it was clear whether the state court proceedings would result in a decision on merits of Defendants' contractual claims. Since that time, there have been two significant developments. First, the state court's ruling that it possessed subject matter jurisdiction over the parties' dispute and its entering of a preliminary injunction have been upheld by the Louisiana Fifth Circuit Court of Appeals, and Plaintiffs have not sought to appeal that decision. Second, the parties entered into a series of settlement agreements. Four agreements were entered into by the parties in their attempt to settle this matter. Only the two agreements that purport to settle the contractual disputes based on the Development Agreements, however, are important for our purposes. The first of these is the Compromise and Settlement Agreement between Jena Band, Machal and BBC ("BBC Settlement Agreement"), the other is the Compromise and Settlement Agreement between Jena Band, Machal and Tri-Millennium ("Tri-Millennium Settlement").

In consideration of the BBC Settlement Agreement, the state court entered a judgment dismissing with prejudice all claims by BBC. Tri-Millennium's claims, however, are still pending, and the state court action is currently stayed.

Based upon the settlement agreements that were entered into by the parties and the state court's determination that it possesses subject matter jurisdiction over the dispute concerning the

4

Development Agreements, Defendants move for dismissal. They argue that the settlement agreements must be treated as final judgments under Louisiana law, and that, therefore, this court is precluded from considering any claims concerning the Development Agreements. Plaintiffs assert that the settlement agreements are void without NIGC approval and, therefore, they are not preclusive . Plaintiffs also reiterate their request that this court issue a declaratory judgment that the state court is without subject matter jurisdiction to hear Defendants' state contract claim.

## II. Law and Analysis

### A.     Standard of Review

When considering a motion pursuant to FED. R. CIV. P. 12(b), the court must construe a complaint liberally and must take all facts pleaded as true. Kane Enter. v. MacGregor (USA), Inc., 322 F.3d 371, 374 (5th Cir. 2003). Summary judgment, on the other hand, may be granted to the moving party only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, when viewed in the light most favorable to the non-moving party, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). Conclusory denials, improbable inferences, and legalistic argumentation are not an adequate substitute for specific facts showing that there is a genuine issue for trial. S.E.C. v. Recile, 10 F.3d 1093, 1097 (5th Cir. 1993).

In the case we now consider, resolution of the issues presented depends only upon statutory and contractual interpretations, both of which are matters of law decided by the court. Chevron

U.S.A., Inc. v. Natural Res. Def. Council, Inc. 467 U.S. 837, 843 (U.S.1984) ("The judiciary is the final authority on issues of statutory construction . . . ."); First Nat'l Bank of Jackson v. Pursue Energy Corp., 799 F.2d 149, 151 (5th Cir. 1986) ("A district court may grant summary judgment when a contract is unambiguous . . . . and [its] determination that a contract is unambiguous is a conclusion of law."). Summary judgment, therefore, is appropriate.

**B.     State Court Subject-Matter Jurisdiction**

Plaintiffs seek a declaration that the state court is without subject matter jurisdiction. It is not within the jurisdiction of this court, however, to question a Louisiana court's determination that it has subject-matter jurisdiction. That court, after fully litigating the issue, determined that it has subject matter jurisdiction over Defendants' causes of action. "The principles of res judicata apply to questions of jurisdiction as well as to other issues." Am. Sur. Co. v. Baldwin, 287 U.S. 156, 166 (1932); Babers v. Babers, 312 So.2d 896, 897 (La. App. 2 Cir. 1975). When "the jurisdiction of a tribunal is actually brought into question in the proceeding before it, such tribunal has the power to determine its own jurisdiction, and once determined, whether right or wrong, that decision cannot ordinarily be attacked collaterally." Mike Hooks, Inc. v. Pena, 313 F.2d 696, 699 (5th Cir. 1963).

Plaintiffs fully litigated the issue of subject matter jurisdiction before the state court and appealed the state court's decision. This court, therefore, is bound by the state court's determination that it had subject matter jurisdiction. Id. Simply put, this court is without jurisdiction to reconsider the state court's determination. For this reason and for the reasons stated in the court's Ruling of

16 December 1998, Defendants' motion for dismissal of Plaintiffs' claim for a declaration that the state court was without subject matter jurisdiction is denied and its request that we dissolve the state court's preliminary injunction if granted

**C.      Res Judicata**

Defendants argue that the settlement agreements preclude Plaintiffs' claims. Plaintiffs respond, however, by arguing that even if the state court did have subject matter jurisdiction, the settlement agreements should be given no preclusive effect for two reasons. First, Plaintiffs argue that claim preclusion does not attach to the state court action pursuant to the Fifth Circuit's test for claim preclusion.[2] When determining the preclusive effect of a state court determination, however, federal courts are to apply the law of the state that made the determination. Gregory v. Drury, 809 F.2d 249, 252 (5th Cir. 1987). The court, therefore, must apply the law of Louisiana when determining the preclusive effect to be given to the settlement agreements.

Under Louisiana law,"[t]o have any preclusive effect a judgment must be valid, that is, among other things, it must have been rendered by a court with jurisdiction over the subject matter." Kelty v. Brumfield, 633 So.2d 1210, 1215, 93-1142 (La. 2/25/1994). As mentioned above, however, this court is bound by the state court's determination that it possessed subject matter jurisdiction. The remaining question, therefore, is whether the settlement agreements have the same effect as a state court judgement. Settlement agreements, which are called transactions in Louisiana, have the

---

[2] Plaintiffs cite Super Van, Inc. v. City of San Antonio, 92 F.3d 366, 370 (5th Cir. 1996) in support of its claim.

force of things adjudged. La. Civ. Code Ann. Art. 3078 (West 2004). Pursuant to LA. REV. STAT. ANN. § 13:4231, therefore, they are preclusive as to all matters within the scope of the agreement. Cassidy v. Joseph, 16 So. 2d 225, 225-26.

The BBC Settlement Agreement and Tri-Millennium Settlement Agreement purport to "settle the claims of the various parties hereto regarding contractual rights and rights of contribution and indemnity, and to settle the priority of claims related to certain contract rights to finance, develop, and manage certain contemplated gaming operations." This includes all claims relating to the Development Agreements. Under Louisiana law, therefore, the settlement agreements, if valid, would preclude Plaintiffs' claim for a declaration declaring the Development Agreements void. Plaintiffs assert, however, that the settlement agreements cannot have any preclusive effect because they are contracts for the management of an Indian casino that are void without the approval of the NIGC. This contention will be addressed below.

### D. Validity of the Settlement Agreements

Plaintiffs contend that the Development Agreements are void pursuant to 25 U.S.C. § 2711 and 25 C.F.R. § 533.7, which provide that management contracts for tribal gaming operations that are not approved by the NIGC are void. This argument rests on the premise that each of these agreements is a management contract under federal law. The court must consider, therefore, whether settlement agreements entitle Machal to summary judgment.

#### 1. Indicia of a Management Contract

Pursuant to 25 C.F.R. § 533.7, "[m]anagement contracts . . . that have not been approved by the Secretary of the Interior or the Chairman . . . are void." The court must determine, therefore, if any of the settlement agreements is a management contract that is void without NIGC approval. There is no precedent in the Western District of Louisiana or in the Fifth Circuit to guide the court in determining what constitutes a management contract. The recent Tenth Circuit opinion in <u>First American Kickapoo Operations v. Multimedia Games, Inc.</u>, however, addressed the issue. –F.3d–, 2005 WL 1463501, *5-6, (10th Cir. 2005). While this opinion has no precedential value in this district, the court finds the reasoning of the Tenth Circuit persuasive and will consider the factors used by the Tenth Circuit in determining whether the settlement agreements are management contracts.

A rule promulgated pursuant to the IGRA defines a management contract as: "any contract, subcontract, or collateral agreement between an Indian tribe and a contractor or between a contractor and subcontractor if such contract or agreement provides for the management of all or part of a gaming operation." 25 C.F.R. § 502.15 (West 2005). Although management is not defined under either a statute or the regulations promulgated by the NIGC, a management official is defined as "one who has authority . . . [t]o set up working policy for a gaming operation." <u>First American Kickapoo Operations</u>, 2005 WL 1463501 at *5-6. (citing 25 C.F.R. § 502.19 (West 2005)). While this is too vague to supply the court with a definition of management, it does indicate that a necessary condition for a management contract is that it grant to a party other than the tribe some authority with regard to a gaming operation.

In determining what types of authority transfers indicate that a document is a management contract, the Tenth Circuit considered the types of terms that 25 U.S.C. § 2711 and in 25 C.F.R. §

9

531.1 require to be articulated in a management contract.³ These terms create certain rights and responsibilities, and thereby, they give content to the concept of management. The terms that indicate a transfer of management authority include, *inter alia*, the following:

1. Transferring responsibility for the performance of the daily operations and maintenance of a gaming operation.

2. Transferring responsibility for the establishment and maintenance of accounting procedures for the gaming operation.

3. Transferring responsibility for financing procedures such as financial reporting and the paying of taxes, employees and other costs.

4. Setting term limits for transfers of powers or conferrals of rights.

5. Quantifying the payments or compensation to which the parties are entitled.

6. Delineating the sources from which payments are to be made. In particular, specifying whether payments are to be based on a percentage of net revenues realized by a gaming operation.

7. Transferring responsibility for and control over the construction of a gaming operation.

25 U.S.C. § 2711 (West 2005); 25 C.F.R. § 531.1 (West 2005).

In light of these terms, the court will review each of the agreements in an effort to determine if they grant to a party other than the tribe management authority with regard to the a gaming operation. Prior to this, however, the court must address two issues. First, Machal contends that the NIGC has previously determined that the disputed agreements are management contracts because such a determination would be owed <u>Chevron</u> deference. Second, because the NIGC states that some of the agreements at issue were collateral to management contracts, the court must determine what types of collateral agreements are void without NIGC approval.

---

³ The Tenth Circuit also noted that the NIGC, in NIGC Bulletin 94-5, states that it considers similar factors in determining whether an agreement is a management contract.

### 2. NIGC Action

As proof that the settlement agreements are management contracts, Plaintiffs cite a letter written by a deputy general counsel for the NIGC, which is dated 30 April 2001. Plaintiffs contend that this letter is evidence of a NIGC determination that the settlement agreements are management contracts. This letter is not, however, a final determination by the NIGC. It is an expression of the NIGC's belief that the agreements and other related documents are management contracts or collateral agreements that are subject to its approval. As such, it is only an advisory opinion or opinion letter. It is not, as Plaintiffs contend, a final determination by the NIGC that the agreements are management contracts.

In an opinion letter dated 23 August 2000, the NIGC clearly indicates that the letters it sends stating that certain contracts are management contracts requiring NIGC approval are merely statements of its opinion. Furthermore, under 25 U.S.C. § 2714 and 25 C.F.R. § 533.4, only determinations to approve or disapprove a management contract made by the *Chairman* of the NIGC after a "complete submission" are final determinations. A "complete submission" of a management contract for approval requires the parties to the provide the NIGC with more than just the contracts themselves. See 25 C.F.R. § 533.3 (West 2005). A letter from the NIGC, dated 30 May 2002, clearly indicates that the parties failed to provide it with the documents requisite for a "complete submission." Therefore, the Chairman of the NIGC did not make a final determination that the agreements are management contracts, and there is no NIGC action to which this court owes deference. First American Kickapoo Operations, 2005 WL 1463501 at *6 (holding that opinion letters and bulletins published by the NIGC are not entitled to Chevron deference). The court will,

however, address the concerns of the NIGC in the following sections.

### 3. Collateral Agreements

In its opinion letter dated 30 April 2001, the NIGC seems to assert that collateral agreements are void without NIGC approval. While the court is hesitant to create a strawman from the NIGC's letter, Plaintiffs urge the court to construe the letter in this manner. We must note, however, that such a contention would be incorrect. An agreement's being collateral to a management contract is not a sufficient condition for it to be void under 25 C.F.R. § 533.7.

A collateral agreement is defined as "any contract . . . that is related, either directly or indirectly, to a management contract." 25 C.F.R. § 502.5. Under 25 C.F.R. § 502.15, a collateral agreement may be considered a management contract, but only if it "provides for the management of all or part of a gaming operation." Similarly, under 25 U.S.C. § 2711(a)(3), collateral agreements are subject to approval by the NIGC, but only if that agreement "relate[s] to the gaming activity."

The provisions of 25 C.F.R. § 533.7 only void management contracts that have not been approved by the NIGC. In other words, only those collateral agreements that should also be considered management contracts because they provide for the management of a gaming operation are void without NIGC approval. Therefore, even if one of the agreements entered into by the parties is a collateral agreement, pursuant to 25 C.F.R. § 502.5, because it is related to a management contract, it still would not be void for lack of NIGC approval unless it also provides for the management of a gaming operation.

Beyond the plain language of the applicable statues and regulations, the policies motivating the enactment of the IGRA, which include providing for "tribal economic development, self-

sufficiency, and strong tribal governments," also support finding that only those collateral agreements that provide for the management of a gaming operation are void. 25 U.S.C. § 2702(1) (West 2005). If any contract that relates to the eventual development of an anticipated gaming operation is construed as a management contract – collateral or otherwise – it would be more difficult for tribes to acquire the economic assistance often needed for procuring land and paying the expenses necessary to the creation of a gaming operation and obtaining the requisite governmental approvals. Potential investors would be unable to contract with tribes, and therefore, they would not be able to ensure that they could recoup any of the money they invested in the tribe.

It is in the best interest of tribes that they be able to enter into enforceable contracts that are precursors to the creation and licensing of a gaming operation. Without such contracts, many tribes would not be able to procure the financial backing that is often necessary for the creation of gaming operations. Such a state of affairs would thwart the policies underlying the IGRA. By making it easier for tribes to obtain financial backing, we make it easier for tribes to acquire the economic development and self-sufficiency that accompanies the income from tribal gaming operations.

For these reasons, the court finds that only collateral agreements that also provide for the management of all or part of a gaming operation are void without NIGC approval.

### 4. The BBC Settlement Agreement

The first agreement we must consider is the BBC Settlement Agreement. This agreement states that it is "intended to settle the claims of [Jena Band, Machal and BBC] regarding contractual rights" related to the Development Agreements. The NIGC, in its opinion letter of 30 April 2001, contends that this agreement is a management contract because it states that Machal and BBC are

to be co-managers of the first Jena Band gaming operation and are described as having management authority.

Under the terms of the agreement, BBC has three primary responsibilities. First, BBC is to release all claims against Jena Band related to the Development Agreements in exchange for $500,000, which is to be paid by Machal. Second, BBC agrees to arrange for the financing for the construction of and initial operating capital for the first gaming operation according to terms acceptable to Jena and Machal in exchange for a promissory note equal to the value of those services. Third, BBC is to enter into a Co-Managers Agreement with Machal that specifies the allocation of managerial responsibility between Machal and BBC.

Machal also agrees to several obligations. First, it agrees to begin the process of acquiring land for Jena Band and to fund certain environmental and other studies necessary for Jena Band to begin a gaming operation in exchange for a promissory note for its expenses. Second, Machal agrees to enter into good faith negotiations with Jena Band, after a Tribal-State Compact has been entered into, for the creation of a financing and development agreement for the construction of a gaming operation. Third, Machal agrees to enter into good faith negotiations with Jena Band and BBC for the creation of a management contract to be submitted to the NIGC. The parties also agree to certain terms, some of which are specified in the Co-Managers Agreement, that are to be included in a management contract that will be negotiated. Finally, Machal agrees to pay BBC $500,000 in exchange for a promissory note in that amount from Jena Band.

Jena Band, for its part, makes three primary promises in the BBC Settlement Agreement. First, it agrees to the payment of the various promissory notes mentioned above. Second, it agrees to give Machal and BBC the exclusive right to gaming on the first gaming operation and the

exclusive right to enter into a management contract with Jena Band for the management of its first gaming operation. Third, it promises to enter into good faith negotiations for the creation of a management contract and agrees that certain terms, including percentage of gaming revenues to be paid and the length of the anticipated management contract, will be included in a management agreement Jena Band will submit to the NIGC for its approval.

The NIGC refers to various provisions of this agreement to support its contention that it is a management contract. First, it cites Section 2.1(c) of the agreement, which refers to BBC and Machal as being co-managers of the first gaming operation to be commenced by Jena Band. Read in context, however, it is clear that this provision does not actually transfer any management authority to Machal or BBC. The pertinent part of that section reads: "Machal and BBC shall enter into good faith negotiations to develop a management agreement with Jena whereby Machal and BBC will be named co-managers of the first Gaming Operation." In this provision of the agreement, Jena Band promises to enter into negotiations for a management agreement that will give management authority to BBC and Machal and will include certain provisions dealing with compensation and the length of the agreement; it does not, however, actually allocate to either of those parties any management authority.

Second, the NIGC cites Section 2.2(c), in which BBC and Machal agree to enter into a Co-Managers Agreement that dictates certain allocations of management authority amongst Machal and BBC that will be included in a future management contract. In this section, however, Jena Band does not grant to either BBC or Machal the right to manage any aspect of an anticipated gaming operation, Jena Band only agrees to include certain provisions in a future management contract yet to be negotiated. The provision does not actually transfer to BBC or Machal any management

15

authority over a gaming operation, therefore, it does not provide for the management of a gaming operation. It is only an agreement by Jena Band to include certain terms in a future management contract that must be submitted to the NIGC for its approval.

While we disagree with the opinion of the NIGC as to those provisions of the BBC Settlement Agreement, another provision of that agreement does, however, transfer to Machal and BBC authority over an anticipated gaming operation. The agreement grants to Machal and BBC the exclusive right to "gaming on the first Gaming Operation . . . and the exclusive right enter into a management contract with Jena [Band]." This arrangement is not only exclusive of other potential management contractors, but also excludes Jena Band from operating a gaming operation on its own. It is an alienation by Jena Band of its right to manage gaming operations located on tribal lands in Louisiana. The BBC Settlement Agreement, therefore, "provides for the management of a gaming operation." Accordingly, the court finds that it is a management contract that is void without NIGC approval pursuant to 25 C.F.R. § 502.15.

### 5. The Tri-Millennium Settlement Agreement

The Tri-Millennium Settlement Agreement requires Tri-Millennium to relinquish its claims against Jena Band in exchange for a payment of $1,350,000. In addition to this amount, which was paid to Tri-Millennium upon the execution of the settlement agreement, the agreement also contemplates various sales of Tri-Millennium's stock that are contingent upon the NIGC's approving a gaming operation for Jena Band, a management contract between Jena Band and Machal, or a financing and development agreement between Jena Band and Machal. In the event that one of these conditions precedent obtains, Tri-Millennium is entitled to payment of $5,000,000

in exchange for all of its stock. Additionally, upon the opening of a gaming operation by Jena Band, Tri-Millennium is entitled to additional payments totaling $20,000,000.

The NIGC seems to assert that this agreement is void for lack of NIGC approval solely because it is an agreement collateral to a management contract, not because it contains any of the terms that would indicate that it is a management contract. This agreement, however, contains the same fatal flaw that afflicts the BBC Settlement Agreement. It contains a provision that grants to Machal and BBC the exclusive right to "gaming on the first Gaming Operation . . . and the exclusive right to enter into a management contract with Jena [Band]." It is, therefore, a collateral agreement that provides for the management of a gaming operation that is void without NIGC approval.

### III. Conclusion

For the above stated reasons and for the reasons stated in the court's Ruling of 16 December 1998, the court makes the following determinations. The court finds that settlement agreements are, as a matter of law, management contracts that are void without the requisite NIGC approval. They are not entitled, therefore, to preclusive effect under Louisiana law. Furthermore, the court finds that because the state court has already determined that its possesses subject matter jurisdiction over the contractual dispute concerning the Development Agreements, we are without jurisdiction over Plaintiffs' cause of action on that issue. Finally, because the state court action is still pending, the court will continue to abstain from considering the issue of the validity of the Development Agreements until such time as it is clear whether the state court will decide that issue. Accordingly, Defendants' motions for dismissal are GRANTED to the extent that Plaintiffs' cause of action for a declaration that the state court is without subject matter jurisdiction and the related request that we

dissolve the state court's preliminary injunction are DISMISSED WITH PREJUDICE. Furthermore, it is ORDERED that this matter be STAYED pending the state court's determination of the validity of the Development Agreements. In all other respects, Defendants' motions are DENIED.

Alexandria, Louisiana

22 July 2005

_____
F. A. LITTLE, JR.
UNITED STATES DISTRICT JUDGE